# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT ) Case No. 21-SC-1938
PREMISES CONTROLLED BY APPLE, INC. PURSUANT TO 18 U.S.C. § )
2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1752(a)(1) )
& (2), 40 U.S.C. §§ 5104(e)(2)(D) & (G), 18 U.S.C. § 111(a) and 18 U.S.C. § )
1512

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____Northern District of California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18 U.S.C. § 111(a) - Assault of a Federal Employee; 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress; 18 U.S.C. §§ 1752(a)(1), (2) and (4) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. §§ 5104(e)(2)(D), (F) and (G) - Violent Entry and Disorderly Conduct on Capitol Grounds.

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jordan Good, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone_____ *(specify reliable electronic means)*.

Date: ____6/10/2021____

_____
*Judge's signature*

City and state: ____Washington, D.C.____

Zia M. Faruqui
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT<br>PREMISES CONTROLLED BY APPLE, INC. PURSUANT TO 18 U.S.C. §<br>2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1752(a)(1)<br>& (2), 40 U.S.C. §§ 5104(e)(2)(D) & (G), 18 U.S.C. § 111(a) and 18 U.S.C. §<br>1512 | )<br>)<br>)<br>)   Case No.  21-SC-1938<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern District of California _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 24, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 6/10/2021 _____          _____
*Judge's signature*

City and state: _____ Washington, D.C. _____          _____
Zia M. Faruqui
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-1938 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to be Searched**

This warrant applies to information which is associated with the Apple, Inc. accounts identified by:

Apple ID: jamesmcgrew0311@icloud.com

Apple ID: jamesmcgrew0331usmc@gmail.com

Apple ID: jamesmcgrew0351usmc@icloud.com

Phone Number: 228-697-2392

and which is stored at premises owned, maintained, controlled, or operated by Apple, Inc., a company that accepts service of legal process at One Apple Park Way, Cupertino, CA

**ATTACHMENT B**

**Particular Things to be Seized and Procedures to Facilitate Execution of the Warrant**

I.      Information to be disclosed by Apple, Inc. ("Apple") to facilitate execution of the warrant

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, including any records that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

34

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

      c.     From November 1, 2020 to the Present: The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

      d.     From November 1, 2020 to the Present: The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

      e.     From November 1, 2020 to the Present: The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

      f.     All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, mail logs,

iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging and query logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

g.      From November 1, 2020 to the Present: All records and information regarding locations where the account was accessed, including all data stored in connection with Location Services;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Within 14 days of the issuance of this warrant, Apple shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

FBI Task Force Officer Jordan Good
Federal Bureau of Investigation
San Diego Field Office
10385 Vista Sorrento Pkwy, San Diego, CA 92121
jwgood@fbi.gov
858-320-8528

II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 111(a) (assault, resisting, or impeding certain officers or employees); 18 U.S.C. §§ 1512(c)(2),2 (obstruction of an official proceeding); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (unlawful entry on restricted buildings or grounds); and 40 U.S.C. §§ 5104(e)(2)(D), (F) and (G) (violent entry, disorderly conduct, and other offenses on Capitol grounds) (collectively, the "SUBJECT OFFENSES") that have been committed by James Burton MCGREW ("MCGREW") and/or other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

a.   Evidence of the identification or location of the user(s) of the Account;

b.   Evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.   Evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.   Evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

e.   Evidence concerning:

i. Planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

ii. Unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

iii. Awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

iv. Efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

v. A conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

vi. The breach and unlawful entry of the U.S. Capitol, and any conspiracy or plan to do so, on January 6, 2021;

vii. The riot and/or civil disorder at the U.S. Capitol on January 6, 2021;

viii. The assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the U.S. Capitol on January 6, 2021;

ix. Damage to, or theft of, property at the United States Capitol on January 6, 2021;

x. Any conspiracy, planning, or preparation to commit those offenses;

xi. Efforts after the fact to conceal or destroy evidence of those offenses;

xii. Materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray, smoke grenades, and tasers;

xiii. Communication devices, including closed circuit radios or walkie-talkies that could have been used to communicate during the unlawful entry into the U.S. Capitol.

xiv. MCGREW's (and others') identity, including photographs and videos depicting clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol;

xv. Paraphernalia used by or associated with MCGREW in connection with the SUBJECT OFFENSES, including a taser, pepper spray or other tools;

xvi. MCGREW's (and others') presence at the January 6, 2021, riot;

xvii. MCGREW's (and others') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

xviii. MCGREW's (and others') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021; and

xix. Evidence of MCGREW's possible affiliation with groups, to include the antigovernment militias groups, antigovernment groups or Sovereign Citizen groups.

III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by Apple and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States. Law enforcement personnel will then seal any information from Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY APPLE, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1752(a)(1) & (2), 40 U.S.C. §§ 5104(e)(2)(D) & (G), 18 U.S.C. § 111(a) and 18 U.S.C. § 1512** | **SC No. 21-SC-1938** <br><br> **Filed Under Seal** |

*Reference: USAO Ref. # 2021R01708; Subject Accounts: jamesmcgrew0311@icloud.com; jamesmcgrew0331usmc@gmail.com; jamesmcgrew0351usmc@icloud.com; phone number (228) 697-2392*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SARCH WARRANT

I, Jordan Good, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information which is associated with **four** accounts—that is, the Apple, iCloud, and iMessage account associated with the following:

(1) the email address **jamesmcgrew0311@icloud.com,**

(2) the email address **jamesmcgrew0331usmc@gmail.com,**

(3) the email address **jamesmcgrew0351usmc@icloud.com**, and

(4) all accounts associated with phone number **(228) 697-2392**

(collectively, the "SUBJECT ACCOUNTS") – which is stored at premises controlled by Apple, Inc. ("Apple"), an electronic communications services provider and/or remote computing services provider which is headquartered at One Apple Park Way, Cupertino, CA. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

1

2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.    I am currently assigned to the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force, as a duly deputized Task Force Officer ("TFO"), and have been so assigned since approximately February 1, 2018, where I specialize in the field of Domestic Terrorism investigations. As part of my duties, I have maintained a high level of continuing education in the rhetoric, symbols, ideology, and tactics of various types of domestic extremists, as well as the laws governing hate crimes, weapons, explosives, and other violent crimes.

3.    I have been a sworn Police Officer since July 2008. I am presently employed by the Coronado Police Department ("CoPD") where I hold the title of Detective. Prior to joining CoPD, I was a Police Officer with the San Diego Police Department for approximately 3.5 years. I possess both a bachelor's degree and master's degree in psychology from Grand Canyon University.

4.    On May 27, 2021, the District of Columbia issued an arrest warrant and criminal complaint, charging James Burton MCGREW ("MCGREW") with violations of 18 U.S.C. § 111(a) (assault, resisting, or impeding certain officers or employees); 18 U.S.C. §§ 1512(c)(2),2 (obstruction of an official proceeding); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (unlawful entry on restricted buildings or grounds); and 40 U.S.C. §§ 5104(e)(2)(D), (F) and (G) (violent entry, disorderly conduct, and other offenses on Capitol grounds) (collectively, the "SUBJECT OFFENSES").

5.     On May 28, 2021, at approximately 9:00 am MST, FBI arrested MCGREW in Glendale, Arizona.

6.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of SUBJECT OFFENSES have been committed by MCGREW and/or other identified and unidentified persons.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

7.     The information contained in this affidavit is based on my own investigation, oral and written reports by special agents of the FBI and other federal, state, and local law enforcement officers who collectively have several decades of experience in investigating domestic terrorism, tips from witness, physical surveillance, interviews, subpoenaed and public records, and database checks. Since this affidavit is being submitted for the limited purpose of securing authorization for the execution of the search warrants, I have not included each and every fact known to me concerning this investigation.   Conversations below are set forth in substance and in part.  The dates, times, and amounts in this affidavit are approximate.

## **JURISDICTION**

8.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

9.       U.S. Capital Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

10.       At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

11.       The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

12.       On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

13.       On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S.

Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

14.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

15.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

16.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

17.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

18.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of

the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

19.    Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



20.    Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

21.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

22.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

23.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

24.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



25.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



26.     An unknown subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



27.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





28.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

29.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

30.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

31.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

32.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

33.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

34.     Beginning around 9:00 p.m., the House resumed work on the Certification.

35.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

36.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

37.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings

to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

38.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

39.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



_____

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





***Facts Specific to MCGREW***

40.     During national news coverage of the aforementioned events, video footage which

appeared to be captured on mobile devices of persons present on the scene depicted evidence of

---

[2]https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

scores of individuals inside the U.S. Capitol building without authority to be there, in violation of

Federal laws.  Photographs and videos of several of these persons were disseminated via social

media and other open source online platforms.  These persons included a white male, wearing a

white t-shirt, and a gray/white/black "Columbia" jacket.  The images below depict the individual,

highlighted with a red box, whom law enforcement has probable cause to believe is MCGREW:





41.     Your affiant is aware that MCGREW has a tattoo across his stomach that states, "KING JAMES."  The tattoo was photographed as part of a series of 2012 booking photographs. A photograph of the tattoo is set forth below.



42.     On January 6, 2021, according to footage from body worn camera worn by the Metropolitan Police Department of the District of Columbia ("MPD") police officers, at approximately 2:52 pm, MCGREW was inside of the U.S. Capitol.  As depicted below, MCGREW lifted his shirt to wipe his eyes, displaying a stomach tattoo:



43.     In the footage, MCGREW aggressively approached law enforcement officers, yelling statements such as "we're coming in here, whether you like it or not" and "fight with us, not against us."  At one point, as MCGREW continued to hold up his phone—a white iPhone with a blue case— MCGREW began to name the officers standing before him and their badge numbers.

44.     At 3:05 pm, according to body worn camera footage, MCGREW was inside of the Rotunda of the U.S. Capitol building.  According to multiple videos, law enforcement pushed the rioters back, to force the rioters towards one exit door.  After MCGREW was pushed back with the crowd, MCGREW lunged forward to strike a law enforcement officer.







45.     After hitting the law enforcement officer, MCGREW retreated away, as law enforcement officers continued to yell to the rioters, "move back."



46.     Within seconds, MCGREW disobeyed law enforcements' commands and moved forward to again approach law enforcement officers.



47.     At one point, as MCGREW continued to scream at law enforcement officers, a law enforcement officer calmly told MCGREW, "just leave, just leave man, come on."  MCGREW yelled back, "You leave.  You leave.  This is our house."

48.    Law enforcement officers attempted to again move the rioters towards the door, using their baton to push the rioters back and repeatedly stating, "move back."   As the law enforcement officers moved MCGREW back, MCGREW struck another law enforcement officer.



49.    MCGREW then lunged for the law enforcement officer's baton:



50.    As seen in the above screenshots, MCGREW often used his phone while inside of the U.S. Capitol, in a manner consistent with filming the above interactions with law enforcement officers.

51.     On January 7, 2021, a concerned citizen ("C-1") contacted FBI regarding MCGREW.  According to C-1, MCGREW told C-1 prior to January 6th that he (MCGREW) intended to travel to Washington D.C. on January 6th to "protest" the "stolen vote."  C-1 advised that MCGREW was not a full QAnon believer, but MCGREW did believe in some elements of the QAnon conspiracy theory, including the "deep state."  C-1 further provided that MCGREW is a former U.S. Marine Corps ("USMC") veteran and provided FBI a photograph of MCGREW, which is set forth below.



52.     On January 21, 2021, your affiant contacted C-1 via telephone, who reiterated his/her previous statement regarding MCGREW.  C-1 also related that MCGREW stated that he had purchased bear mace to bring to the rally in D.C. in case things got out of hand.  In addition, C-1 advised that another person had notified C-1 that MCGREW showed this person a video on MCGREW's cellular phone, which depicted MCGREW inside the U.S. Capitol.

53.     On February 26, 2021, another concerned citizen ("C-2") called the FBI National Threat Operations Center and stated that MCGREW assaulted Capitol Police Officers on January 6, 2021.

54.     On March 3, 2021, your affiant contacted C-2 via telephone who advised he/she had photos of MCGREW.  On March 3, 2021, C-2 provided via email three photographs of an individual believed to be MCGREW inside the U.S. Capitol.  The photographs provided by C-2 appear to be the same photograph with different annotations. One of the photographs provided by C-2 is set forth below.



55.     Your affiant conducted a check of MCGREW in law enforcement databases.  The databases revealed two phone numbers associated with MCGREW as (228) 697-2392 ("2392 Number") and (228) 383-4110 ("4110" Number).   According to subscriber information from AT&T Corporation, "James B McGrew" has been the subscriber of the 2392 Number since May

17, 2020, and the subscriber of the 4110 Number since June 9, 2020.  The records also listed an email address of jamesmcgrew0331usmc@gmail.com and a resident address of 11369 Allen Road, Biloxi, MS 39532.[4]

56.     Your affiant learned that on January 6, 2021, the 2392 Number was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the U.S. Capitol building.

57.     Your affiant further obtained records from American Airlines, which confirmed that MCGREW flew from San Diego, California to Arlington, Virginia on January 5, 2021, and returned from Arlington, Virginia to San Diego, California on January 7, 2021.

58.     On April 26, 2021, MCGREW left California and flew to Mississippi for a hearing on his state court case.[5]

59.     On April 28, 2021, MCGREW was scheduled to see his state probation officer at 8:30 am.  According to flight records, MCGREW was scheduled to fly back that same day.

60.     According to MCGREW's probation officer, MCGREW never showed up for the meeting.

61.     On April 28, 2021 your affiant learned that MCGREW's mother filed a missing person report on MCGREW in Mississippi who was reported to have taken his mother's gray 2005 Ford F-150 truck bearing Mississippi license plate: HA52578 and Vehicle Identification Number 1FTRF12295KD48384 ("the Truck").

---

[4] Your affiant believes that MCGREW's mother resides in Mississippi and that the mother uses the 4110 Number.

[5] MCGREW pled to the following state charges: possession of a precursor, shoplifting, and theft of a motor vehicle.  Your affiant learned that MCGREW was on parole in Mississippi when he committed the above offenses on January 6, 2021.  As of March 2021, MCGREW has been on probation.

62.     On May 7, 2021, a U.S. Magistrate Judge in the District of Colombia issued a cell tracking warrant, which directed the communication provider of MCGREW's 2932 Number to provide real-time tracking and geo-location information (e.g., Global Positioning Satellite and/or cell site information) for the phone.  The information received from this warrant revealed that beginning on or about May 18, 2021, the phone left the state of Mississippi and began travel toward California along the interstate, arriving in Gilbert, Arizona on May 19, 2021.

63.     On or about May 19, 2021, your affiant and other FBI agents executed federal search warrants on the sober living facility located at 1572 Glacier Road, Oceanside, California, where MCGREW is believed to have briefly lived before traveling to Mississippi.   During the search of MCGREW's room at the sober living facility, a "Colombia" jacket, which appeared identical to the jacket worn by MCGREW while he was inside the U.S. Capitol on January 6, 2021, was seized.

64.     On May 19, 2021, your affiant served Apple, Inc. with a preservation letter under 18 U.S.C. § 2703(f) for the customer or subscriber account information for accounts associated with email jamesmcgrew0331usmc@gmail.com or the 2392 Number.

65.     While the phone associated with the 2392 Number appeared to remain in the area of Gilbert, Arizona, your affiant learned from U.S. Border Patrol that on May 20, 2021, at approximately 3:00 PM PST, MCGREW encountered Border Patrol agents at the U.S. Border Patrol immigration checkpoint at Campo Station, located at 32355 Old Highway 80, Pine Valley, California, driving the Truck east on Interstate 8.  MCGREW was the sole occupant of the Truck. During the encounter, MCGREW stated that he was enroute to 2850 Pio Pico Drive, Carlsbad, California.

66.     Thereafter, your affiant was contacted by a concerned citizen ("C-3") who your affiant previously encountered during the execution of the search warrant at the sober living facility at 1572 Glacier Road, Oceanside, California.  C-3 advised s/he heard from another resident at the sober living facility that MCGREW was back in San Diego attempting to return to the sober living facility.  C-3 advised the residents of the sober living facility did not want MCGREW back at the facility, and that C-3 would assist in locating another sober living facility for MCGREW.

67.     Your affiant learned that on May 23, 2021, at 10:06 PM PST, MCGREW applied for entry into the U.S. from Mexico via the San Ysidro Port of Entry driving the Truck.  MCGREW was accompanied by passenger.  MCGREW informed U.S. Customs and Border Protection personnel he met his passenger on May 23, 2021, when she was sleeping outside of the hotel MCGREW was staying at in Vista, California.  MCGREW provided the 2392 Number, phone number 760-579-8538, and email address: jamesmcgrew0331usmc@gmail.com to U.S. Customs and Border Protection personnel.  MCGREW additionally stated he was going to move to Arizona with his half-sister, Brandy Clayton.

68.     Result of law enforcement databases yield that on May 25, 2021, at 8:15 AM MST, the Truck's license plate was scanned by a license plate reader around Glendale, Arizona.

69.     On May 27, 2021, Apple, Inc. responded to a subpoena and identified the SUBJECT ACCOUNTS as being associated with MCGREW.

70.     On May 28, 2021, at approximately 9:00 AM MST, FBI arrested MCGREW outside of his sister's apartment in Glendale, Arizona.  At the time of his arrest, MCGREW confirmed that a white iPhone in a blue case and a black Samsung phone, both located inside of his sister's apartment, belonged to him.

71.     As depicted below, you affiant believes that the phone with MCGREW on the date of his arrest appears to be the same iPhone MCGREW used while inside of the U.S. Capitol:



72.     According to the iCloud features in each of the following iCloud accounts—jamesmcgrew0311@icloud.com,          jamesmcgrew0331usmc@gmail.com,          and jamesmcgrew0351usmc@icloud.com—the "iCloud Photos" option is turned on.

73.     Each of the above accounts also shows significant activity in the "CLOUDPHOTOLIBRARY" after January 6, 2021.

74.     In addition, both the jamesmcgrew0331usmc@gmail.com and the jamesmcgrew0351usmc@icloud.com accounts show significant activity on May 20, 2021—the day after FBI executed the search warrant at the sober living facility.

75.     At this time, your affiant cannot determine what the activity is, but the activity is within the "CLOUDPHOTOLIBRARY."

76.     Accordingly, your affiant believes that it is probable that MCGREW committed the SUBJECT OFFENSES. As such, your affiant further believes it is probable that the SUBJECT ACCOUNTS contain evidence of the SUBJECT OFFENSES.

## BACKGROUND CONCERNING APPLE [6]

77.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

78.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.     iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud

---

[6] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502

Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

        e.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

        f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

        g.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

79.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Appleprovided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

80.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

81.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that

reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

82.   Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

83.   Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and

web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

84.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. The investigation to date of MCGREW's conduct on January 6, 2021 indicates that MCGREW used his cellular phone while at the U.S. Capitol and appeared to be video-taping his surroundings. As MCGREW's cellular 2393 Number is connected to the SUBJECT ACCOUNTS, evidence of MCGREW's unlawful conduct is likely to be found in the SUBJECT ACCOUNTS.

85.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation,

date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

86.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

87.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

88.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users. Specifically, these include iCloud and iMessage content, including all media; and all downloaded applications for the period for which this warrant is sought.

**REQUEST TO SUBMIT WARRANT BY TELEPHONE**

89.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Lucy Sun, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

**CONCLUSION**

90.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Apple, Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

DATE: June 10, 2021

JORDAN GOOD
Task Force Officer
FBI San Diego Joint Terrorism Task Force

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 10th day of June, 2021.

HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE